**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**WAYNE I.,**

                              **Plaintiff,**

v.                                                          **5:19-CV-709 (NAM)**

**ANDREW M. SAUL, COMMISSIONER**
**OF SOCIAL SECURITY,**

                              **Defendant.**

**Appearances:**

Howard D. Olinsky
Olinsky Law Group
250 South Clinton Street, Suite 210
Syracuse, New York 13202
*Attorney for Plaintiff*

Kevin M. Parrington
Social Security Administration
J.F.K. Federal Building, Room 625
15 New Sudbury Street
Boston, Massachusetts 02203
*Attorney for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Wayne I. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

challenging the denial of his application for Supplemental Security Income ("SSI") benefits.

(Dkt. No. 1).  The parties' briefs are presently before the Court.  (Dkt. Nos. 9, 10).  After

carefully reviewing the administrative record, ("R," Dkt. No. 8), and considering the parties'

arguments, the Court reverses the denial decision and remands for further proceedings consistent with this Order.

## II.     BACKGROUND

### A.     Procedural History

Plaintiff applied for disability benefits in September 2015, alleging disability beginning December 31, 2005.  (R. 155–62).  Plaintiff asserted that he is disabled due to anxiety.  (R. 179).  The Social Security Administration ("SSA") denied Plaintiff's application on December 4, 2015.  (R. 41–58).  Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 63–65).  The SSA acknowledged Plaintiff's request, and a hearing was held on May 8, 2018 before ALJ Elizabeth W. Koennecke.  (R. 26–29).  Plaintiff was represented at the hearing by his attorney, Paul Iaconis, but Plaintiff declined to appear unless he could do so by video teleconference or in-person and with the door open.  (*See id.*).  The ALJ denied the request and rescheduled the hearing.  (*Id.*).  On August 14, 2018, the ALJ held another hearing where Plaintiff's representative appeared in-person and Plaintiff observed via telephone.  (*See* R. 30–40).  On August 20, 2018, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 11–21).  Plaintiff's subsequent request for review by the Appeals Council was denied on April 18, 2019.  (R. 1–5).  Plaintiff then commenced this action on June 14, 2019. (Dkt. No. 1).

### B.     Plaintiff's Background

Plaintiff was born in 1971.  (R. 42).  He received his GED in 2012 and received additional vocational training in "building maintenance" in 2014.  (R. 180).  Plaintiff has worked in sales and as a fast food worker.  (R. 180).

Plaintiff stated that he attends weekly mental health appointments.  (R. 190).  He reported sleep disturbances including tossing and turning all night, and waking up in cold sweats.  (R. 187).  He stated that he has difficulty getting along with others because he "do[es] not like people."  (R. 191).  He reported that "[he] used to get along with anyone." (R. 191).  He reported having trouble getting along with bosses, teachers, police, and landlords, stating that he "ha[s] a problem with all authority."  (R. 193).  He reported that stress makes him want to "get away from everything and everybody."  (R. 193).  Plaintiff reported no physical illnesses or conditions.  (R. 191–92).

Regarding daily activities, Plaintiff reported that he spends his days caring for his children, watching television, and going for walks.  (R. 186).  He reported no difficulties with personal care, household chores, or simple meal preparation.  (R. 188).  He does not have a driver's license, but is able to walk or ride his bike when he leaves his home.  (R. 189).  Plaintiff reported that he is able to leave his house between three to four times per week.  (R. 189).

### C.      Medical Evidence of Disability

#### 1.      Family Counseling Services of Cortland County

In July 2014, Plaintiff began mental health treatment with therapist Ashley LeClair, LMSW, at Family Health Counseling Services of Cortland County.  (R. 257).  Plaintiff reported that he had been suffering from "emotional outbursts" for the past several months. (R. 257).  Plaintiff began bi-weekly treatment appointments with various social workers so he could "learn to manage his emotions," and "reduce thoughts that trigger impulsive behavior and increase self talk that controls [his] behavior."  (R. 257).  Plaintiff was prescribed Lamictal to help manage his mood and emotions.  (*See, e.g.*, R. 256, 262, 273).  Plaintiff's treatment

records show that he generally reported that he was depressed, anxious, and sometimes had

panic symptoms of sweating, chest pain, and shortness of breath.  (*See* R. 261, 272–73, 286,

313, 337, 355, 367, 370).

LeClair's treatment notes indicate that Plaintiff suffered from post-traumatic stress

disorder ("PTSD") and "unspecified bipolar" disorder.  (R. 263).  Plaintiff reported a history of

behavioral issues as a child and teen, and noted that he was "placed in hospitals and residential

settings throughout his childhood."  (*See* R. 282, 349, 351).  Plaintiff reported that he was

hospitalized as a child because he "hit teachers with chairs."  (R. 349).

In March 2016, LeClair completed a medical source statement in which she assessed

that Plaintiff was "not significantly limited" in his ability to understand, remember, and carry

out very short and simple instructions.  (R. 300).  She noted that he was "extremely limited" in

his social functioning, and "moderately limited" in his activities of daily living, and his ability

to maintain concentration, persistence and pace.  (R. 300).

By April 2016, LeClair noted in a progress report that Plaintiff "ha[d] made significant

progress overall," and that he "continues with medication adjustments with [his] prescriber."

(R. 260).  LeClair reported that Plaintiff was "compliant" with the treatment plan, but he still

exhibited poor affective control, support, and verbalization, as well as low impulse control.  (R.

257).  She further noted that Plaintiff's mental limitations currently caused significant

impairment in his ability to interact socially.  (R. 258).

On May 18, 2016, Plaintiff began treatment with therapist Melissa A. Smizek, LMSW.

(R. 275).  Smizek reported that Plaintiff was articulate, that his concentration, insight,

judgment, and attention were "good," and that he exhibited "appropriate" mood and behavior.

(R. 275).  She noted that Plaintiff reported having difficulties being challenged and that he experienced "fear-based thoughts."  (R. 276).

On August 29, 2017, therapist Chrystal Fox-McCormick, MFT-LP, reported that Plaintiff continued to struggle with his anger and anxiety.  (R. 331).  On February 13, 2018, Plaintiff returned to Fox-McCormick and reported that he still experienced issues with anger. (R. 348).  Specifically, Plaintiff reported that he would have blackouts, during which he would become violent.  (R. 348).  A mental status examination revealed that Plaintiff's attitude was angry and guarded; he had a blunted mood and affect; and poor insight and judgment.  (R. 349).  Plaintiff reported that he experienced violence while he was in prison, and that his social anxiety causes him to "want to harm white males."  (*Id.*).  Plaintiff stated that "he can go from 0-10 quickly" if someone "talks aggressively to him."  (*Id.*).  Fox-McCormick noted that Plaintiff's conditions significantly impaired his ability to interact socially and would be very upsetting to his peers.  (R. 351).  She noted that Plaintiff continued to need treatment to deal with his anger and depression.  (R. 353).  On July 4, 2018, Fox-McCormick noted that Plaintiff continued to have problems with low impulse control, and that he still exhibited poor affective control, support, and verbalization.  (R. 373).

### 2.    Psychiatric Consultative Examination

In November 2015, Plaintiff presented to Katie Lewis, Ph.D. for a consultative psychiatric evaluation.  (R. 244–48).  He informed Dr. Lewis that he was going to weekly psychotherapy sessions since 2014.  (R. 244).  Plaintiff reported that he had difficulty sleeping and experienced symptoms of depression including frequent dysphoric moods, loss of usual interest, social withdrawal, diminished sense of pleasure, and occasional feelings of hopelessness.  (R. 244).  He described suffering from anxiety-related symptoms including

excessive apprehension and worry, feelings of restlessness, difficulty concentrating, and extreme irritability. (R. 245). He also noted that he has "nightmares, flashbacks, increased startle response, and hypervigilance related to trauma that he experience[d] while in maximum security prison in 2014." (*Id.*). He stated that he experiences "periodic blackouts during which he will become extremely violent and assault others[,] primarily men." (*Id.*). He stated that this tends to occur in "enclosed spaces with other males and specifically Caucasian males," which he believes is "related to past trauma that he experienced while in prison." (*Id.*). He reported that the last of these "blackouts" occurred in September or October of 2015. (*Id.*).

Dr. Lewis noted that Plaintiff's thought processes were "coherent and goal directed." (R. 246). She assessed that his mood was "dysthymic," and found that his affect was "depressed, anxious, and tense." (*Id.*). Dr. Lewis reported that Plaintiff's attention and concentration were "intact," but his memory skills were "impaired, likely due to anxiety and emotional distress secondary to depression." (*Id.*). She found that Plaintiff's insight and judgment were "good" and that his intellectual functioning was "average." (R. 247.). Dr. Lewis also noted that Plaintiff is able to dress, bathe, groom himself, and perform household chores. (*Id.*). He reported that his wife managed their money and did the shopping and cooking. (*Id.*).

Dr. Lewis's medical source statement concluded that:

> [Plaintiff] evidences mild limitations following and understanding simple directions and instructions and mild limitations performing simple tasks independently. He has mild limitations maintaining attention and concentration and mild limitations maintaining a regular schedule. He has mild limitations learning new tasks. He has moderate limitations performing complex tasks independently and moderate limitations making appropriate decisions. He has marked limitations relating adequately with others and marked

6

> limitations appropriately dealing with stress.  His difficulties are caused primarily by mood regulation issues, symptoms of anxiety, and trauma-related symptoms.
>
> The results of this examination appear to be consistent with psychiatric problems, and this may significantly interfere with [Plaintiff's] ability to function on a daily basis.

(R. 247–48).  She found that Plaintiff's prognosis was "guarded, given the chronicity and severity of his current symptoms," and noted that Plaintiff should "continue with psychological treatment."  (R. 248).

### 3.   Physical Consultative Examination

In November 2015, Plaintiff presented to Kautilya Puri, M.D. for a consultative internal medicine examination.  (R. 250–52).  Plaintiff reported that his primary complaints were asthma, anxiety, and depression.  (R. 250).  Plaintiff's physical exam was generally unremarkable, with no evidence of physical limitations.  (*See* R. 250–52).  Dr. Puri's medical source statement concluded that:

> [Plaintiff] did not have any objective limitation to communication or fine motor/gross motor activities.  There were no objective limitations to [Plaintiff's] gait or to activities of daily living on examination today.  It is recommended that the claimant be seen by a psychologist.  It is recommended that he not be in an environment which will increase respiratory complaints.

(R. 252).  He found that Plaintiff's prognosis was "fair."  (*Id.*).

### 4.   Dr. H. Tzetzo, State Agency Consultant

In December 2015, State agency psychologist H. Tzetzo, Ph.D. reviewed Plaintiff's initial application for disability benefits.  (R. 42–52).  Dr. Tzetzo did not examine Plaintiff, but based his evaluation on the medical evidence of record, including the consultative examinations by Drs. Puri and Lewis.  (R. 43–44).  Dr. Tzetzo determined that Plaintiff's medically determinable impairments included affective disorder, anxiety, and asthma.  (R.

45).  Dr. Tzetzo found that Plaintiff's conditions did not meet the Listing criteria because they only caused "mild limitations" in Plaintiff's ability to carry out activities of daily living and "moderate limitations" to maintaining social functioning, concentration, persistence and pace. (R. 45).  Dr. Tzetzo determined that "the preponderance of evidence suggests [Plaintiff] is able to perform simple work tasks – involving mainly brief and superficial contact with supervisors, coworkers and the public."  (R. 46).  He assessed that Plaintiff was "moderately limited" in his ability to: (1) "interact appropriately with the general public"; (2) "accept instructions and respond appropriately to criticism from supervisors"; and (3) "get along with coworkers or peers without distracting them or exhibiting behavioral extremes."  (R. 50).

### D.   ALJ's Decision Denying Benefits

On August 20, 2018, the ALJ issued a decision denying Plaintiff's application for disability benefits.  (R. 11–21).  As an initial matter, the ALJ noted that on the date of the hearing, Plaintiff refused to enter the room because he would become "extremely violent" if the door to the room was closed.  (R. 11).  The ALJ decided that various alternatives proposed by Plaintiff's attorney "were unacceptable for either privacy, practical, or ethical reasons."  (R. 11).  Accordingly, the ALJ found that Plaintiff "knowingly and voluntarily waived the right to personally appear and testify at a hearing."  (R. 11).  The ALJ thus issued the decision "pursuant to the provisions of 20 C.F.R. 416.1448(b)."  (R. 11).

As to the merits, the ALJ determined at step one of the five-step evaluation process, that Plaintiff had not engaged in any substantial gainful activity since August 15, 2015, the amended onset date of his disability.  (R. 13).

At step two, the ALJ found that, under 20 C.F.R. § 416.920(c), Plaintiff had a "severe" impairment due to "all mental impairments as variously characterized."  (R. 13).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). (R. 15).

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels. He retains the ability to understand and follow simple instructions and directions, perform simple tasks independently, maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule, and handle simple, repetitive work-related stress in that he can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require him to supervise or manage the work of others. He should avoid work requiring more complex interaction or joint effort to achieve work goals. He can have no contact with the public.

(R. 15–16).

At step four, the ALJ determined that Plaintiff has no past relevant work because his "earnings records reveal that he has never worked at a level of substantial gainful activity." (R. 19).

At step five, based on Plaintiff's age, education, job skills, and work experience, as well as testimony from the vocational expert, the ALJ found that Plaintiff would be able to work as a "government sorter," "surveillance systems monitor," or a "dietary aide." (R. 20). Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

## III.    DISCUSSION

### A.    Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.   If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 416.920.  The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 416.945.  In assessing the RFC of a claimant with multiple impairments, the SSA

10

considers all "medically determinable impairments," including impairments that are not severe.  *Id.* at § 416.945(a)(2).  The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last.  *Selian*, 708 F.3d at 418.

### B.      Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error.  42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).  The substantial evidence standard is "very deferential," and the Court may only reject the finding by the ALJ "if a reasonable factfinder would *have to conclude otherwise*."  *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

C.      **Analysis**

Plaintiff challenges the Commissioner's denial decision, arguing that: (1) the ALJ violated his due process rights when she "refused to provide [him] the opportunity to testify in a proper hearing"; and (2) the RFC determination was not supported by the medical evidence. (Dkt. No. 9, pp. 9–19).  Plaintiff asserts that he never waived his right to testify at his disability hearing and that the ALJ erred by failing to accommodate his requests as to the format of his testimony at the hearing.  (*Id.*, pp. 9–12).  Plaintiff further argues that the "ALJ failed to properly weigh the opinion evidence from [his] treating provider, properly explain her reasoning for failing to include all of the opined limitations from the [consultative examiner] to whose opinion she granted considerable weight, or to incorporate the limitations opined by the non-examining State agency opinion to whom she granted great weight."  (*Id.*, pp. 12–19).

In response, the Commissioner asserts that Plaintiff's due process rights were not violated because the ALJ was not required to "reschedule the hearing or modify its parameters based on Plaintiff's last-minute request to testify via videoconference or in a hearing room with the door open."  (Dkt. No. 10, pp. 5–10).  The Commissioner argues that the ALJ properly accounted for the opinions of Plaintiff's treating providers by limiting his RFC to low stress, routine work with no contact with the public.  (*Id.*, pp. 10–16).  The Commissioner further contends that the ALJ's decision to reject Dr. Lewis' opinion that Plaintiff had marked limitations in relating adequately with others was supported by treatment notes that "repeatedly show that Plaintiff had adequate social skills," and "that Plaintiff's treatment was generally successful."  (*Id.*, pp. 16–17).

### 1. Due Process

As to the due process issue, the Court finds that the ALJ should have specifically considered Plaintiff's mental limitations before finding that he knowingly and voluntarily waived the right to personally appear and testify at a hearing.  The ALJ issued her decision pursuant to 20 C.F.R. § 416.1448(b), which permits an ALJ to issue a decision without a hearing where the claimant "do[es] not wish to appear," *and* either: (1) the parties "indicate in writing" that the claimant does not want to testify; *or* (2) the claimant lives outside the United States.  Here, there is no evidence of any written agreement, and the record shows that Plaintiff appeared on the hearing date, but claimed he would become "extremely violent" if the door to the hearing room was closed, which is consistent with his allegations of explosive outburst related to anxiety and PTSD.  (*See* R. 28–29).  Thus, Plaintiff's failure to testify appears to be directly related to his social limitations and problems with authority, and not due to a desire not to testify.

Further, the Regulations state that "good cause" may exist for the failure of a claimant to appear at a hearing, and in determining whether good cause exists, the ALJ must "consider any physical, mental, educational, or linguistic limitations . . . which a plaintiff may have."  20 C.F.R. §§ 416.1457(b)(1)-(2).  Here, the ALJ did not analyze whether Plaintiff had good cause not to appear at the hearing, nor did she adequately explain why she rejected Plaintiff's proposed alternatives for his testimony. (*See* R. 11).  The Commissioner claims that the absence of testimony was harmless because Plaintiff was represented by an attorney at the hearings, but the Court finds that Plaintiff's testimony could have provided relevant evidence as to the extent of his social limitations, which were central to his disability claim.  Therefore, Plaintiff did not have a reasonable opportunity to provide testimony in support of his

application, and remand is necessary on this basis. *See Saephan v. Barnhart*, No. C 01-02660 SI, 2003 WL 22309450, at *3–5, 2003 U.S. Dist. LEXIS 17887, at *7–14 (N.D. Cal. Oct. 1, 2003) ("The Court remands this case for consideration by the Commissioner of whether the plaintiff had good cause for failure to appear at the hearing."); *cf. Carpenter v. Colvin*, No. 13-CV-859, 2014 WL 4637085, at *2–3, 2014 U.S. Dist. LEXIS 128976, at *5–8 (N.D.N.Y. Sept. 16, 2014) ("While the court considers Carpenter's mental limitations in determining good cause, Carpenter does not indicate that she did not attend due to her mental illness issues.").

### 2.   RFC Determination

In making an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. § 416.945.  An ALJ must specify the functions the plaintiff is capable of performing and may not simply make conclusory statements regarding a plaintiff's capacities. *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).  The RFC assessment must also include a narrative discussion, specifically describing how the evidence supports the ALJ's conclusions. SSR 96-8p, 1996 WL 374184, at *7.  The failure of an ALJ to specify the basis for the RFC is reason enough to vacate a decision of the Commissioner. *See, e.g.*, *White v. Sec'y of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990) (remanding because the Secretary failed to articulate the basis for the findings as to claimant's residual functional capacity).

Here, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, with the main limitation being that he "can have no contact with the public" based on his moderate limitations to social interaction and stress management.  (R. 15–16). This sort of work requires the ability "to respond appropriately to supervision, coworkers, and

usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4. And "[a] substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." *Id.*

After careful review of the record, the Court does not find substantial evidence to support the ALJ's determination that Plaintiff has only moderate limitations to social interaction and stress management. (*See* R. 15). The ALJ's decision relies heavily on the non-treating and non-examining State agency consultant, Dr. Tzetzo, as well as Plaintiff's activities of daily living. (*See* R. 15–19). However, that limited evidence is overwhelmed by the medical records and opinions from Plaintiff's treating and examining providers.

The ALJ gave "great weight" to Dr. Tzetzo's opinion that Plaintiff would be "able to perform low contact work involving mainly brief and superficial contact with supervisors, coworkers, [and] the public." (R. 15–16). The ALJ also cited evidence that Plaintiff "cares for his children, started to establish a company, formed new relationships, and only missed appointments due to transportation issues during the period at issue." (R. 19). Notably, the RFC only limits Plaintiff to "no contact with the public," despite Dr. Tzetzo's inclusion of coworkers and supervisors.[1] Further, Plaintiff's reported daily activities do not refute the considerable medical evidence that Plaintiff had significant limitations in his ability to deal with others, especially authority figures. (*See, e.g.*, R. 193, 281, 348–49).

Indeed, Dr. Lewis (examining psychological consultant) found that Plaintiff had "marked" limitations in his ability to relate adequately with others. (R. 247). Dr. Lewis also

---

[1] The Court also notes that the ALJ posed a hypothetical to the vocational expert which included limitations for "very little contact with coworkers" and "occasional contact with supervisors," but those limitations were not included in the final RFC, and the ALJ did not explain why those limitations (which appear to be well-supported in the record) were omitted. (*See* R. 15–19, 39).

noted that Plaintiff reported experiencing "periodic blackouts during which he will become extremely violent and assault others[,] primarily men." (R. 245). Plaintiff reported to Dr. Lewis that he "stays at home due to attempt to minimize any exposure to stressors." (R. 245). Dr. Lewis described Plaintiff's affect as "depressed, anxious, and tense," found him to be "somewhat evasive," and opined that his symptoms were "related to trauma that he experience[d] while in maximum security prison in 2014." (R. 245). She also noted that Plaintiff "had one incidence of becoming assaultive towards his wife." (R. 245).

The ALJ's decision affords Dr. Lewis' opinion "considerable weight," but then fails to specifically explain why she rejected Dr. Lewis' findings of marked limitations to dealing with stress and relating adequately with others. (*See* R. 18–19, 247). Dr. Lewis's assessments are also consistent with the treatment records from Plaintiff's therapists, who frequently reported poor affective and impulse control, and diagnosed him with PTSD, intermittent explosive disorder, and bipolar disorder. (*See* R. 273, 294–95, 313–14). Therapist LeClair found that Plaintiff was "extremely limited" in his social functioning, and noted that he would be unable to meet competitive standards for employment due to his inability to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with coworkers without exhibiting behavioral extremes. (R. 300). Notably, LeClair's findings appear to have been based on regular counseling appointments from 2014 through 2016. (R. 257–66, 300). LeClair's findings are also consistent with Plaintiff's report that he has problems getting along with supervisors and other people in authority, and his reports that he has attacked people during explosive outbursts in the past. (R. 193). Although the progress notes from Plaintiff's therapists show some limited improvement over time, there are also treatment records from as

16

late as July 2018 showing that Plaintiff continued to struggle with low impulse control, and poor affective control, support, and verbalization.  (*See* R. 373).

Taken together, Plaintiff's statements and the opinions from the treating and examining providers all flatly contradict the ALJ's finding that Plaintiff had only moderate limitations with regard to adaptation, interacting with others, and managing one's self.  (*See* R. 15). Indeed, there appears to be no evidence whatsoever that Plaintiff is capable of interacting with coworkers, and supervisors in particular.

In sum, the ALJ's reliance upon selective medical findings from the non-examining consultant and Plaintiff's daily activities do not amount to substantial evidence to support the RFC determination.  Therefore, Plaintiff's case must be remanded for further proceedings consistent with this Order.  *See Brittany F. v. Comm'r of Soc. Sec.*, No. 18-CV-1365, 2020 WL 838076, at *7–9, 2020 U.S. Dist. LEXIS 28566, at *18–22 (N.D.N.Y.  Feb. 19, 2020) (remanding for further proceedings where the ALJ afforded great weight to a consulting psychologist but failed to address or account for that consultant's assessment of marked limitations to stress); *see also McCann v. Comm'r of Soc. Sec.*, No. 18-CV-472, 2020 WL 207134, at *3–4, 2020 U.S. Dist. LEXIS 6378, at *7–12 (W.D.N.Y. Jan. 13, 2020) (remanding where the ALJ credited certain findings from a psychiatric consultative examiner, but "failed to make specific findings about the nature of [the] claimant's stress, the circumstances that trigger it, and how those factors affect his or her ability to work").

On remand, the Commissioner should focus on the impact of Plaintiff's ability to relate adequately with supervisors and coworkers in a work setting, paying particular attention to the opinions of Plaintiff's treating providers and examining consultants.  Then, if appropriate, the Commissioner should develop an RFC that is supported by substantial evidence and that fully

17

explains the findings as to Plaintiff's social limitations, and accounts for any resulting erosion of the occupational base available to him.  The Commissioner should also assess whether good cause exists for Plaintiff's alleged inability to appear at an in-person hearing due to his social limitations and provide a detailed explanation supporting such findings.

## IV.    CONCLUSION

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   July 1, 2020
         Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge